UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
UNITED STATES OF AMERICA,

              - against -

ARON CHERVIN, et al.,

                           Defendants.
------------------------------------------------------------X

10 CR 918 (RPP)

**OPINION & ORDER**

**ROBERT P. PATTERSON, JR., U.S.D.J.**

On May 31, 2011, Defendant Yuri Zelinsky ("Zelinsky" or "Defendant") moved to suppress documents and a cellular telephone ("cell phone") as illegally seized by the Federal Bureau of Investigation ("FBI") during his arrest on October 13, 2010 for conspiracy to commit mail fraud and healthcare fraud. (Arrest Warrant dated October 7, 2010.) Evidentiary hearings on the motion were held on August 25 and August 29, 2011 ("the hearing"). For the reasons that follow, the motion to suppress is denied.

**I.    Background**

On October 13, 2010, at approximately 6 a.m., agents from the FBI and other Federal and New York State agencies effectuated Defendant's arrest at his apartment.

At the hearing, the Government called as witnesses Mr. Joe Loscalzo, an employee of Defendant's building management company, who testified as to structural changes in Defendant's apartment from the original floor plan. Special Agent Alexey Abrahams of the FBI ("SA Abrahams") and Special Agent Stacy Nimmo of the FBI ("SA Nimmo") testified as to the facts and circumstances of Defendant's arrest. The Defense called no witnesses.

## The Arrest

SA Abrahams, the lead agent in charge of Defendant's arrest, testified that on October 13, 2010, at approximately 5:15 a.m., a meeting was held to discuss "the tactics to be used for the arrest of Mr. Zelinsky, items to be aware of in terms of plain view seizure, FBI deadly force policy and the plan once we had Mr. Zelinsky in custody." (Suppression Hear'g Transcript ("Tr.") at 18.) SA Abrahams described the nature of the charges filed against the Defendant and "told all the agents participating in the arrest to be aware of cell phones and to be aware of medical billing documents and documents associated with BABS Medical." [1] (Id. at 18.) Additionally, the agents discussed the conduct of a protective sweep of the apartment. SA Abrahams testified that he "instructed the other agents that once Mr. Zelinsky was in custody to conduct a protective sweep of the area." (Id. at 19.) SA Abrahams also stated that he was aware that Zelinsky has made an application to the New York Police Department to obtain a license for a firearm. (Id. at 17.) SA Abrahams was not aware of any other individuals residing in the apartment with Defendant. (Id. at 48.)

At 6 a.m., approximately six agents arrived at Zelinsky's apartment. (Id. at 19.) SA Abrahams testified that he could not recall whether he knocked or rang the bell on Defendant's door. (Id. at 49.) Defendant answered the door dressed in what appeared to be sleeping attire. (Id. at 20.) SA Abrahams and another member of his team placed the Defendant under arrest at a location just inside Defendant's front door. (Id. at 20, 50.) While SA Abrahams and the other agent were handcuffing Defendant; the other agents began to conduct a protective sweep. (Id. at 20-21.) SA Abrahams testified that from the place of arrest just inside the doorway, he could see

---

[1] BABS Medical Supply, Inc. was referenced in pre-arrest meetings as associated with Zelinsky. An address associated with BABS Medical Supply, Inc. was the same as Zelinsky's home address. (Tr. at 15-16.)

the entrances to the two closest rooms which were approximately ten feet away.²

SA Abrahams then asked the Defendant if there was a firearm in the residence and Defendant replied that there was a rifle in his bedroom closet. (Id. at 22-23.) SA Abrahams alerted the other agents to the location of the firearm. (Id. at 23.) The rifle was subsequently recovered by agents in the closet of the master bedroom. (Id. at 24.) Approximately one minute after the arrest, Defendant was escorted down the hall and placed on the couch in the living room. (Id. at 55.)

After Defendant was placed on the couch in the living room, agents went to the adjoining master bedroom to collect clothes to allow Defendant to get dressed for transport to the FBI office and subsequent arraignment. (Id. at 45.) Those agents alerted SA Abrahams to the presence of a cell phone on the nightstand of the master bedroom. (Id. at 43.) SA Abrahams then entered the master bedroom, observed, photographed, and seized the cell phone because Defendant had been captured on wiretaps speaking on a cell phone. (Id. at 46.)

*The Protective Sweep*

SA Nimmo testified that after the Defendant was placed in handcuffs near the threshold of the apartment, the agents conducted the protective sweep and that she entered the second door on the left side of the hall, a bedroom which had been converted into a home office. (Id. at 85-89.) SA Nimmo stated that the distance from the apartment threshold to the home office was approximately "five to eight, five to ten feet." (Id. at 88.) SA Nimmo was not able to see into the entire room from the threshold of the home office door. (Id. at 91-92.)

QUESTION: Now, Special Agent Nimmo, for what reason did you enter into the

---

² SA Abrahams stated on direct examination that the bedroom closest to the doorway was configured for use as a home office. (Id. at 28.) However, on cross examination, SA Abrahams conceded that the second bedroom on the left-hand side of the hallway may have been the location of the home office. (Id. at 56-57.) Subsequent testimony by SA Nimmo confirmed that the home office was in fact located in the second bedroom on the left-hand side. (Id. at 85.)

3

>           bedroom that we have marked on Government Exhibit 1?
>
> ANSWER:   The purpose of our protective sweep was to find any persons that may be in the apartment that could cause harm to any of the agents.

(Id. at 85.)

On cross-examination SA Nimmo acknowledged that at the pre-arrest briefing there was no discussion of individuals, other than Defendant, residing in the apartment. (Id. at 90.) She was asked whether at the threshold of the home office, she was able to see into the entire room. SA Nimmo answered "[N]o I was not. There was a bed. A person could secret themselves under a bed or under a desk or behind a door, so I entered into the room." (Id. at 91-92.) Nor could she see all the corners of the room from the threshold of the home office door. (Id. at 92.) SA Nimmo was not able to say for an absolute fact that when she entered the home office she had her gun drawn, although she believed that it was. (Id.)

SA Nimmo testified that she notified SA Abrahams that BABS Medical Supply, Inc. records were in plain view in the home office and that she did not touch them. (Id. at 88.) SA Abrahams testified that upon learning this, he entered the room and began taking pictures of the various stacks of documents with his Blackberry cell phone. (Id. at 35.) The documents were not touched by agents in any manner prior to the pictures being taken. (Id. at 37.) SA Abrahams testified that the pictures marked as Government Exhibits 4-13 included documents addressed to BABS Medical from Astoria Federal Savings Bank, "documents that looked like ledgers, invoices and bills, including handwritten and typewritten invoices, bills, things like that." (Id. at 38.) SA Abrahams seized those documents. (Id. at 43.)

## II.     Discussion

Defendant argues that the agents entry into the room went beyond the permissible scope

of a protective sweep and that the documents were seized in violation of the Fourth Amendment.

As an initial matter, law enforcement officers generally do not require a search warrant to enter an individual's home when they possess a valid arrest warrant. See Payton v. New York, 445 U.S. 573, 603 (1980). The parties do not dispute that the FBI agents were legally present in Defendant's home for the purposes of making the arrest. The parties differ, however, on the legality of the protective sweep conducted by agents following the arrest of Defendant. A protective sweep is a "quick and limited search of premise, incident to an arrest and conducted to protect the safety of police officers or others." Maryland v. Buie, 494 U.S. 325, 327 (1990). The Supreme Court has held that a limited protective sweep is permissible under the Fourth Amendment "in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors a danger to those on the arrest scene." Id. at 327. The Court in Buie also held that as an incident to an arrest, "the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." Id. at 334. To conduct a more extensive search, however, law enforcement must possess articulable facts which would lead them to reasonably believe the area to be swept contains an individual posing a threat. Id. The protective sweep may "extend only to a cursory inspection of those spaces where a person may be found," and may last no longer than "is necessary to dispel the reasonable suspicion of danger . . . ." Id. at 335.

The Government relies on the search of the home office being of a space immediately adjoining the place of arrest from which an attack could be immediately launched. (Government's Omnibus Memorandum of Law in Opposition to Pre-trial Motions ("Gov. Mem."), dated July 1, 2011, at 20.) The Government does not argue, while not conceding, that it

possessed the articulable facts necessary for a reasonably prudent officer to believe that an individual posing a threat to their safety was located in another section of the apartment. (Gov. Mem. at 18, n.2.)  Indeed, the FBI pre-arrest briefing provided no information that any other individuals resided with Defendant, nor any reason to believe Defendant was harboring anyone in the apartment, let alone anyone who could potentially cause a threat to law enforcement. Moreover, Defendant had no criminal record or known propensity for violent behavior. (See E-justice report on Yuri Zelinsky, Government Exhibit 16.)  Defendant argues that since the agents had no evidence that another person was in the apartment and this was an arrest for a non-violent crime, a protective sweep was unnecessary and thus violated Defendant's Fourth Amendment rights. Therefore, the Court must decide if the agents protective sweep into the home office was within the parameters laid out in Buie.

Upon examination of the layout of the apartment and review of the testimony; the Court concludes that the home office was an immediately adjoining space to the place of arrest and thus SA Nimmo's limited search was within the ambit of a protective sweep authorized under legal precedents.  SA Abrahams and SA Nimmo both testified that the home office was no more than 10 or 15 feet from the location of Defendants arrest. (Tr. at 21, 88.) Physical distance alone, however, is not the determining factor in evaluating if a space could present danger to law enforcement. "Although the Buie court did not define further what it meant by the term 'spaces immediately adjoining the place of arrest from which an attack could be immediately launched,' other courts applying Buie have interpreted this phrase to include rooms that are directly adjacent to the place of arrest." United States v. Harris, 629 A.2d 481, 493-94 (D.C. 1993); see United States v. Lauter, 57 F.3d 212, 217 (2d Cir. 1995).  Indeed, courts have held that arrests made in hallways with adjacent bedroom entrances are subject to the Buie "immediately adjoining"

protective sweep. See United States v. Thomas, 429 F.3d 282, 287 (D.C. Cir. 2005) ("Because the entrance to the bedroom was a straight shot down the hallway from the spot where Thomas was arrested, the bedroom was a place immediately adjoining the place of arrest from which an attack could be immediately launched.") (internal quotations omitted); United States v. Robinson, 775 F. Supp. 231, 232 (N.D. Ill. 1993) (holding a protective sweep of a bedroom valid because arrest was made at the mouth of interior hallway leading to the bedroom). Ultimately, the "safety of the officers, not the percentage of the home searched, is the relevant criterion." Thomas, 429 F.3d at 287.

Defendant argues that agents should have been able to see that no one was present in the home office room by simply observing from the hallway. (Declaration of Sam Schmidt dated May 31, 2011.) This argument is unpersuasive and contrary to SA Nimmo's testimony that a person could have been behind the bed, desk, door, or hidden in a corner. (See supra p. 4.) The Court in Buie held that while warrantless protective sweeps must be limited and not unnecessarily invasive; agents are permitted to conduct a "cursory inspection of those spaces where a person may be found." Buie, 494 U.S. at 335. Agents are justified in searching these types of spaces to ensure their personal safety. See United States v. Lauter, 57 F.3d 212, 217 (2d Cir. 1995) (agent justified in looking in the space between the bed and wall); United States v. Hassock, 676 F. Supp. 2d 154, 159 (S.D.N.Y. 2009) (agents search under bed during protective sweep permitted).

With regards to the agents seizure of the cell phone, SA Abrahams testified that Defendant was dressed in sleeping attire. New York FBI policy and previous decisions in this Circuit require law enforcement to locate appropriate clothing for a Defendant's court appearance. See United States v. Di Stefano, 555 F.2d 1094, 1101 (2d Cir. 1977) (officers have a

7

duty to properly dress an individual after arrest); United States v. Titus, 445 F.2d 577, 579 (2d Cir. 1971). Additionally, Defendant informed the agents that he would need his medication which meant it had to be collected from his bedroom or his bathroom adjacent thereto. (Tr. at 36.) Thus, it would be necessary for the agents to enter the master bedroom to obtain his clothing and medication.

Defendant's cell phone was seized by SA Abrahams in Defendant's master bedroom upon notification of its presence. (Id. at 46.) Defense counsel appears to have acknowledged that the agents were lawfully in the master bedroom and justified to seize evidence in plain view while they were securing Defendant's clothing. (Id. at 98.) SA Abrahams testified he seized the cell phone after being notified by the agents that it was in plain view in the master bedroom because he knew that Defendant was captured on cell phone wiretaps discussing the activities of the alleged fraud. (Id. at 46.)

### III.  Conclusion

Agents lawfully entered Defendant's home office and master bedroom under appropriate circumstances and seized documents and a cell phone pursuant to the plain view exception to the warrant requirement. Accordingly, Defendant's motion to suppress is denied.

IT IS SO ORDERED.

Dated: New York, New York
September 20, 2011

Robert P. Patterson, Jr.
U.S.D.J.

Copies of this Order sent to:

*Counsel for the Defendant:*

Sam A. Schmidt
Sam A. Schmidt Law Office
111 Broadway
Suite 1305
New York, NY 10006
212 346-4666
Fax: 212 346-4665


*Counsel for the Government:*

Jason Peter Hernandez
U.S. Attorney's Office, SDNY
One St. Andrew's Plaza
New York, NY 10007
(212)-637-1024
Fax: (212)-637-2527

Rebecca Anne Rohr
U.S. Attorney's Office, SDNY
One St. Andrew's Plaza
New York, NY 10007
(212)-637-2531
Fax: (212)-637-2527

William Joseph Harrington
United States Attorney Office, SDNY
One Saint Andrew's Plaza
New York, NY 10007
(212)-637-2331
Fax: (212)-637-2937